# United States Court of Appeals for the Federal Circuit

04-5020, -5032

HOME SAVINGS OF AMERICA, FSB,
and H.F. AHMANSON & COMPANY,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

Michael Carvin, Jones Day, of Washington, DC, argued for plaintiffs-cross appellants. With on the brief was Debra L. Satinoff. Of counsel on the brief were Steven S. Rosenthal, Jeffery A. Tomasevich, and Douglas A. Tucker, Kaye Scholer LLP, of Washington, DC.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief was Stuart E. Schiffer, Deputy Assistant Attorney General. Of counsel on the brief were Jeanne E. Davidson, Deputy Director, Lee M. Straus, Attorney, and John N. Kane, Jr., Attorney.

Appealed from: United States Court of Federal Claims

Senior Judge Eric Bruggink

# United States Court of Appeals for the Federal Circuit

04-5020, -5032

HOME SAVINGS OF AMERICA, FSB,
and H.F. AHMANSON & COMPANY,

Plaintiffs-Cross Appellants,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: March 7, 2005

_____

Before MICHEL, Chief Judge,[*] NEWMAN and PROST, Circuit Judges.

PROST, Circuit Judge.

Home Savings of America, FSB ("Home") is a wholly-owned subsidiary of H.F. Ahmanson & Co. ("Ahmanson"). Home was engaged in the savings and loan business at the time of the transactions involved in this appeal. In these transactions, Home purchased a number of failing thrifts between 1981 and 1985. The parties and the United States Court of Federal Claims refer to these transactions as the Florida/Missouri transaction, the Illinois/Texas transaction, the Century transaction, and the Ohio transaction, and we adopt this terminology as well. In the Ohio transaction, Home acquired one federally insured thrift, as well as several thrifts that were insured

---

[*] Paul R. Michel assumed the position of Chief Judge on December 25, 2004.

by the state of Ohio (the "Ohio-insured thrifts"). In the other transactions, all acquired thrifts were federally insured.

Home and Ahmanson sued the government for breach of a contractual agreement to accord them favorable accounting treatment with respect to all of these acquisitions. Specifically, Home and Ahmanson claimed that the government had promised to allow Home to count supervisory goodwill from those acquisitions toward its federally mandated minimum level of capitalization. The government denied that it had made a binding promise and that Ahmanson had standing to seek damages for breach of an alleged promise made solely to Home.

The Court of Federal Claims issued three published opinions in this matter. In the first decision, the court granted summary judgment to the plaintiffs that the government breached its promise to count supervisory goodwill. Home Sav. of Am., F.S.B. v. United States, 50 Fed. Cl. 427, 439, 442 (2001) ("Home I"). At the same time, the court also granted summary judgment to the government regarding the Ohio-insured thrifts, reasoning that the Federal Home Loan Bank Board ("FHLBB") did not have statutory authority to promise that Home could count supervisory goodwill from its purchase of the Ohio-insured thrifts. Id. at 441-42. In the second opinion, the Court of Federal Claims denied the government's motion for summary judgment based on Ahmanson's alleged lack of standing. Home Sav. of Am., F.S.B. v. United States, 51 Fed. Cl. 487, 497-500 (2002) ("Home II"). Finally, the Court of Federal Claims conducted a bench trial on damages and awarded $134,045,000 to the plaintiffs. Home Sav. of Am., F.S.B. v. United States, 57 Fed. Cl. 694 (2003) ("Home III").

The government appeals the rulings on standing, breach, and damages. Home and Ahmanson cross-appeal the court's grant of summary judgment relating to the government's authority to promise supervisory goodwill for the Ohio-insured thrifts. We affirm each of the directly appealed rulings. With respect to the cross-appeal, we vacate the summary judgment and remand to the Court of Federal Claims for further proceedings regarding the Ohio-insured thrifts.

## I. BACKGROUND

### A. The Savings and Loan Crisis

The series of events generally known as the "Savings and Loan Crisis" began to unfold in the late 1970s and early 1980s. Squeezed by the dual pressures of inflation and high interest rates, many savings and loan institutions, or thrifts, failed during that period of time. The Federal Savings and Loan Insurance Corporation ("FSLIC"), although legally committed to compensating depositors whose savings were lost, lacked sufficient funds to bail out all of the failing thrifts. To mitigate FSLIC's insurance liability, FHLBB began to encourage healthy thrifts to take over troubled ones by offering them special accounting treatment, according to which they would be permitted to count supervisory goodwill[1] toward meeting their reserve capital requirements. Allowing the acquiring thrifts to count supervisory goodwill functioned as a substitute for a cash inducement from FSLIC to acquire a failing thrift and assume its liabilities.[2]

---

[1] Supervisory goodwill is the excess of the purchase price paid for a thrift over the fair value of all identifiable assets acquired. United States v. Winstar Corp., 518 U.S. 839, 848-49 (1996).

[2] These background facts are discussed in considerably more detail in Winstar, 518 U.S. at 844-58.

## B. Relevant Transactions

Home acquired a total of seventeen thrifts in the four transactions at issue in this appeal. An "Assistance Agreement" signed by FSLIC and Home accompanied each transaction. Home I, 50 Fed. Cl. at 430-33. The Florida/Missouri and Illinois/Texas Assistance Agreements contained clauses that integrated FHLBB resolutions and letters issued contemporaneously with the agreements. Id. at 430-32. The Century and Ohio Assistance Agreements also integrated specific FHLBB resolutions addressed to the respective transactions.[3] Id. at 432-33.

For each transaction, Ahmanson sought federal assistance to mitigate the liabilities its subsidiary, Home, was assuming by taking over these thrifts. In response, FHLBB stated in the Florida/Missouri and Illinois/Texas Resolutions that Home could count supervisory goodwill from each transaction toward its reserve capital requirement. Id. at 431-32. FHLBB also issued net worth deficiency forbearances contemporaneously with the Century and Ohio transactions stating that FSLIC would not take action against Home for failing to meet reserve capital requirements as a result of Home's assumption of liabilities in those transactions. Id. at 432-34. Later the government enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), which breached various agreements by the government to allow thrifts to count supervisory goodwill. See Winstar, 518 U.S. at 856-68.

Alleging such a breach, Home and Ahmanson brought suit in the Court of Federal Claims. The court found the government liable with respect to all the transactions except the acquisition of four state-insured thrifts that were included in the

---

[3] For additional detail on these transactions, see Home I, 50 Fed. Cl. at 429-34, and Home II, 51 Fed. Cl. at 488-94.

Ohio transaction.  For those acquisitions, the Court of Federal Claims held that FHLBB was not authorized to promise to allow Home and Ahmanson to count supervisory goodwill because these institutions were not insured by FSLIC.  In particular, the Court of Federal Claims held, 12 U.S.C. § 1725(c)'s general authorization to make contracts does not apply to contracts regarding supervisory goodwill because such contracts are specifically covered under 12 U.S.C. § 1729(f).  Home I, 50 Fed. Cl. at 441-42.

In ruling on the government's motion for summary judgment on the standing issue, the Court of Federal Claims rejected the government's contention that Ahmanson did not have standing to sue because it was not in privity of contract.  The government had argued that only Home was a party to the contract, and that Home did not suffer any damages because only Ahmanson had to raise capital as a result of the breach. The court acknowledged that only Home, and not Ahmanson, signed the Assistance Agreements, which had a "sole benefit" clause limiting their applicability to third parties. The court concluded, however, that in each merger the Assistance Agreement was a part of a larger transaction to which Ahmanson was a party.  It based this conclusion on Ahmanson's initiation of the negotiation process by seeking FHLBB approval of Home's acquisitions and its promise to maintain the net worth of Home above regulatory minimums.  Home II, 51 Fed. Cl. at 497-99.  Thus, according to the Court of Federal Claims, Ahmanson and the government had made a mutual agreement to support Home in its takeover of failing thrifts.  Id. at 499.

At the damages stage, the government argued that Generally Accepted Accounting Principles ("GAAP"), requiring a shortened amortization period, applied with

respect to the Century and Ohio transactions,[4] but the Court of Federal Claims found that FHLBB promised to allow a forty-year supervisory goodwill amortization period. Home III, 57 Fed. Cl. at 702-06. In calculating damages, the Court of Federal Claims awarded Ahmanson the costs of replacing the lost supervisory goodwill with cash through various financings and retention of earnings. Id. at 709-28. However, to offset the incidental benefit the plaintiffs derived from obtaining "tangible capital" to replace intangible supervisory goodwill, the court discounted the damages by the rate paid on an intermediate-term Treasury bond. Id. at 722-24. The resulting award of $80,936,000 was "grossed up" to $134,045,000 to compensate for the taxes Ahmanson's present parent company, Washington Mutual, would pay on the award. Id. at 730-31.

## II. DISCUSSION

### A. Standard Of Review

We review a trial court's decisions on summary judgment and conclusions of law without deference. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002); Alger v. United States, 741 F.2d 391, 393 (Fed. Cir. 1984). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We review the court's findings of fact under the deferential clearly erroneous standard. Anderson v. City of Bessemer City, 470 U.S. 564, 573-76 (1985); Landmark Land Co. v. FDIC, 256 F.3d 1365, 1373 (Fed. Cir. 2001).

Different standards of review are applicable to different aspects of a damages award. This court has held that "the amount of a prevailing party's damages is a finding

---

[4] It was undisputed that a 40-year amortization period applied to the Florida/Missouri and Illinois/Texas transactions. Home III, 57 Fed. Cl. at 702.

of fact . . . .  Thus, where the amount is fixed by the court, review is in accordance with the clearly erroneous standard of Fed. R. Civ. P. 52(a)."  SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991).  "However, certain subsidiary decisions underlying a damage theory are discretionary with the court . . . .  Such decisions are, of course, reviewed under the abuse of discretion standard."  Id.

It is not always easy to tell where the dividing line between these two types of issues lies.  In patent cases, the overall amount of damages and the elements of entitlement to "lost profit" damages are factual issues subject to review for clear error.  Id. at 1164-66 & n.2.  However, the "choice of an accounting method for determining profit margin" and "the methodology for arriving at a reasonable royalty" are discretionary.  Id. at 1164.  In contract cases, causation, foreseeability, and certainty are questions of fact reviewed for clear error, as is the discount rate applied to reduce an award of future lost profits to present value.  Energy Capital Corp. v. United States, 302 F.3d 1314, 1332 (Fed. Cir. 2002).  Yet, this court has also stated that "[d]amages determinations by the Court of Federal Claims are reviewed under an abuse of discretion standard."  Massie v. United States, 226 F.3d 1318, 1320 (Fed. Cir. 2000).

Earlier, and therefore controlling, precedent leads us not to read Massie as creating a per se rule that abuse of discretion applies to all damages issues on appeal from the Court of Federal Claims.  See Hughes Aircraft Co. v. United States, 86 F.3d 1566, 1573 (Fed. Cir. 1996), vacated and remanded on other grounds, 520 U.S. 1183 (1997), remanded to 140 F.3d 1470, 1477 (Fed. Cir. 1998)  (reviewing the Court of Federal Claims' eminent domain valuation and determination of a reasonable royalty for clear error and its selection of a method to arrive at a reasonable royalty for abuse of

discretion). Rather, the clear error standard governs a trial court's findings about the general type of damages to be awarded (e.g., lost profits), their appropriateness (e.g., foreseeability), and rates used to calculate them (e.g., discount rate, reasonable royalty). The abuse of discretion standard applies to decisions about methodology for calculating rates and amounts. See Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 n.8 (Fed. Cir. 1995) (characterizing a case that applied abuse of discretion to damages in general as "not intended to overrule the distinction made in SmithKline . . . between the clearly erroneous review of the amount of damages and abuse of discretion review of methodology").

As applied to the present case, we review for clear error the trial court's conclusions (described in more detail below) that the plaintiffs were entitled to the cost of replacement capital, that Ahmanson reasonably mitigated damages, that the damages were foreseeable, and that the damages would be taxed at a particular rate. We review the court's methodology for assessing the cost of replacement capital, including its use of a "safe rate" of return to account for the inherent benefits of the replacement capital, for abuse of discretion.

## B. The Appealed Rulings

First, the government appeals the Court of Federal Claims' denial of its motion for summary judgment on standing, in which the court held that Ahmanson was in privity of contract with the government and could therefore recover damages. Second, the government challenges that court's finding at trial that GAAP, as interpreted by the Financial Accounting Standards Board ("FASB"), did not apply to the amortization of

goodwill from the Century and Ohio transactions,[5] having been superseded by the government's promise to Home that it could amortize the supervisory goodwill over a forty-year period. Third, the government challenges the Court of Federal Claims' damages model and resulting award for a variety of reasons, including the court's finding that Ahmanson had reasonably mitigated its damages, its award of "hypothetical" replacement costs, its determination that the damages it awarded were foreseeable, and the gross-up of the damages award for tax purposes.

Home cross-appeals the court's summary judgment determination that FSLIC and FHLBB did not have authority to promise to allow supervisory goodwill from the Ohio-insured thrifts.

## C. Analysis

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3). As discussed below, we first affirm the judgment of the Court of Federal Claims that Ahmanson was in privity of contract and therefore had standing to sue. Second, we affirm the court's determination that the parties agreed to a forty-year amortization period for supervisory goodwill, and that GAAP did not shorten this amortization period. Third, we affirm the court's holding that GAAP did not require Home to write off supervisory goodwill when it sold its branches between 1993 and 1995. Fourth, we affirm the court's damages award. Finally, with regard to the cross-appeal, we vacate the court's grant of summary judgment to the government on the issue of statutory authority to promise to count supervisory goodwill for the Ohio-insured thrifts.

---

[5] In ruling on the issue of the applicability of GAAP to the Ohio transaction, the Court of Federal Claims did not distinguish between the state-insured and federally insured thrifts, but rather treated the transaction as a whole. See Home III, 57 Fed. Cl. at 702-06.

## 1. Privity

The government asserts that the court erred in holding that Ahmanson was in privity of contract with the government. The centerpiece of the government's argument is that Ahmanson was not a signatory to the Assistance Agreements. The government points out that an express contract precludes finding an implied-in-fact contract dealing with the same subject matter. Additionally, the government argues, the "sole benefit" clause in the Assistance Agreements excludes Ahmanson from claiming privity. The government rejects the view that Ahmanson's negotiations with FHLBB, whereby Ahmanson promised to maintain Home's net worth to gain regulatory approval, could demonstrate contractual intent because Ahmanson's commitment to maintain Home's net worth was statutorily required. Finally, the government asserts that shareholders do not have standing to assert Winstar claims under Glass v. United States, 258 F.3d 1349 (Fed. Cir. 2001); Cain v. United States, 350 F.3d 1304 (Fed. Cir. 2003); and FDIC (Karnes County) v. United States, 342 F.3d 1313 (Fed. Cir. 2003).

The plaintiffs reply with a three-part argument as to why Ahmanson was in privity of contract with the government. First, they assert, it is irrelevant whether the parent or the subsidiary suffered the loss due to the increased cost of capital resulting from the government's breach of contract, because Home's earnings were diminished when Home was forced to use privately raised capital in place of supervisory goodwill. Second, even though Ahmanson was not a party to the Assistance Agreements—and here the plaintiffs point out that FHLBB was not a party to the Assistance Agreements either—Ahmanson was a party to the contractual arrangement as a whole by way of FHLBB's Resolutions. The Resolutions recognized that the "offer" that led to the

04-5020, -5032                              10

contract was Ahmanson's application for regulatory approval of Home's purchases; those Resolutions required Ahmanson to maintain Home's net worth in compliance with applicable regulations; and the Resolutions were "unified" with the Assistance Agreements because the integration clauses defined the "Entire Agreement" as including not just the Assistance Agreements themselves but also the related resolutions issued by FHLBB.

We affirm the Court of Federal Claims' conclusion that Ahmanson was in privity of contract with the government and could therefore recover damages as a result of the government's breach. The Assistance Agreements, regardless of their "sole benefit" clause, do not preclude Ahmanson from having any contractual rights. See Winstar, 518 U.S. at 907-09; Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1346 (Fed. Cir. 2001). Although Ahmanson did not itself sign the Assistance Agreements, the Court of Federal Claims properly focused on a set of "larger transaction[s]" involving Ahmanson, FSLIC, FHLBB, and Home. See Home II, 51 Fed. Cl. at 497-99. In each transaction, the Assistance Agreement is not the entire contract; the Resolutions contain reciprocal promises that were part of the overall bargains between the plaintiffs and the government. Ahmanson promised it would maintain Home's net worth; in exchange, the government promised to provide financial assistance by promising certain accounting treatment for goodwill. As the court found, "The resolutions . . . reflect mutual, reciprocal obligations by both Ahmanson and the United States to support Home Savings." Id. at 499. Ahmanson was party to the larger transactions in which those obligations were incurred; the government's promise therefore runs directly

04-5020, -5032                                            11

to Ahmanson. Accordingly, Ahmanson is in privity of contract and consequently has standing to seek damages in this case.

Similarly, we are not convinced by the government's counter-arguments. The government's challenge to the Court of Federal Claims' finding of an "implied-in-fact agreement" is correct, as far as it goes, but it focuses narrowly on the court's solitary slip in terminology, and not on the substance of what the court actually did. See id. at 498. Rather than finding what is technically known in the law as an implied-in-fact agreement, the Court of Federal Claims held that Ahmanson was a party to the overall agreement between the plaintiffs and the government. As the court recognized, the Assistance Agreements were not the sum total of what the parties had agreed to. See id. at 497-98. The court also recognized Ahmanson as the offeror that initiated the negotiations that ultimately led to the agreement, Ahmanson as having promised to maintain Home's net worth, and Ahmanson as having "contracted with the government[.]" Id. at 498-99. The court further found that both Ahmanson and the government had assumed "mutual, reciprocal obligations" to support Home. Id. at 499. This reasoning uniformly suggests that the court considered the contract at issue in this case to be an agreement among not only Home and the government, but also Ahmanson. To the extent the trial court's application of the label "implied-in-fact agreement" to the contract at issue is inconsistent with this rationale, it is harmless error.

Moreover, the Glass, Cain, and FDIC cases, although they address the standing of investors to assert Winstar claims, are not directly on point. In these cases, this court denied standing to shareholders. Glass, 258 F.3d at 1355; Cain, 350 F.3d at 1310;

<u>FDIC</u>, 342 F.3d at 1314.  In the present case, Ahmanson was not only a shareholder, but an essential participant as a contracting party in each of the acquisitions at issue. Ahmanson negotiated for approval of Home's acquisitions, and "it was Ahmanson that FHLBB recognized as obligating itself, as part of that acquisition, to maintain Home Savings' net worth."  <u>Home II</u>, 51 Fed. Cl. at 499.

For these reasons, we uphold the trial court's determination that Ahmanson was in privity of contract with the government and therefore has standing to assert claims for breach.

## 2.  Application of GAAP Accounting Principles

The government contends that the Court of Federal Claims erred in finding that GAAP did not control the computation of supervisory goodwill in the Century and Ohio transactions.  The Assistance Agreements for these transactions contained clauses stating that "any computations made for purposes of the Agreement" would be governed by GAAP.  The Assistance Agreements did not otherwise address the period over which goodwill would be amortized.  Thus, the government reasons, there was no promise to permit "extended amortization" of supervisory goodwill over forty years.  The government therefore concludes that, under our precedent, it is not bound to the extended amortization schedule.  <u>See</u> <u>Anderson v. United States</u>, 344 F.3d 1343 (Fed. Cir. 2003); <u>D&N Bank v. United States</u>, 331 F.3d 1374 (Fed. Cir. 2003).  The government further asserts that its application of the initial baseline regulatory policy of forty years did not change the contractual term requiring GAAP or suggest a commitment to protect Home from changes in regulatory policy.  (The FASB later changed the GAAP supervisory goodwill amortization period from forty years to

between eight and twelve years.)  Moreover, the government argues, the Century and Ohio Resolutions, like the Assistance Agreements, required Home to adhere to GAAP.

The plaintiffs argue that the government promised that the Century and Ohio supervisory goodwill would amortize over forty years.  The plaintiffs rely on the Assistance Agreements' lack of an indication that goodwill specifically (as opposed to accounting generally) would be governed by GAAP, coupled with the Resolutions' statement that goodwill and its amortization period are required to conform with "regulatory requirements," to support their entitlement to a forty-year amortization period, which was FHLBB's applicable regulatory policy when the contract was formed.  Moreover, the plaintiffs point out, the government's Supervisory Agent did not object when Home filed regulatory documents describing how it treated supervisory goodwill stemming from the Century and Ohio transactions.

We affirm the conclusion of the Court of Federal Claims that the contracts provided for a forty-year amortization period for supervisory goodwill.  The Century and Ohio Resolutions did not specify an amortization period, but they did set out the process by which the amortization period would be determined.  Home III, 57 Fed. Cl. at 704 ("Home Savings was to provide regulators with an analysis, supported by independent auditors, [that] included the proposed amortization period for supervisory goodwill arising from those transactions.").  The Court of Federal Claims found that Ahmanson had provided circumstantial evidence that "such an analysis was furnished at the time and that the schedule adopted by the bank and regulators called for 40 year amortization."  Id.  This circumstantial evidence of an agreement to amortize supervisory goodwill over forty years included frequent thrift financial reports to

regulators and routine regulatory audits, and in none of those instances did the regulators object to Home's use of a forty-year amortization schedule. Id. at 704-05. As the Court of Federal Claims found, "it is unreasonable to believe that regulators would have allowed Home Savings to amortize supervisory goodwill over a 40 year period absent an understanding that this was the implementation of the process agreed upon in the Century and Ohio Assistance Agreements." Id. at 705.

These factual findings are not clearly erroneous, and we agree with the inference that the Court of Federal Claims drew from them in the trial on damages: that the parties had agreed to an amortization period other than the one provided by GAAP for the supervisory goodwill amortization period for all of Home's acquisitions at issue in this case, including the Century and Ohio transactions. See id. at 703-05. The Court of Federal Claims correctly concluded that the contracts provided for a forty-year amortization period for supervisory goodwill.[6]

---

[6] The present case is distinguishable from Anderson and D&N Bank, in which this court held that the government had not manifested assent to the plaintiffs' requests for extended amortization of goodwill. In each of those cases, there was no document analogous to the Assistance Agreements between Home and the government referring to the accounting treatment to be employed. In the absence of any such memorialization of an actual agreement between the parties, we determined that the mere issuance of FHLBB resolutions approving the mergers did not demonstrate that the government intended to be contractually bound. See Anderson, 344 F.3d at 1353, 1356; D&N Bank, 331 F.3d at 1378, 1381. The present case, like Winstar, presents us with not only a resolution approving the merger, but documentary evidence of a contractual agreement, which incorporated resolutions by reference. (We do not address here whether a resolution may be sufficient to show a contract in some circumstances. See Anderson, 344 F.3d at 1356-57.) Having determined that the Assistance Agreements demonstrated the parties' intent to contract, the Court of Federal Claims permissibly looked to other evidence to determine that contract's terms. See D&N Bank, 331 F.3d at 1381.

### 3. Branch Sales

The government asserts that GAAP also required Home to write off supervisory goodwill when it sold savings and loan branches after the passage of FIRREA. According to this argument, the Court of Federal Claims should have accounted for this mandatory write-off in its damages award. Because the court did not do this, the government argues that the court's figures for supervisory goodwill that remained after the branch sales were too high.

The plaintiffs respond that the branch sales occurred after the government's breach, so they are irrelevant for purposes of calculating damages. Also, the plaintiffs contend that the Illinois/Texas and Florida/Missouri transactions were precluded from being subjected to a write-off requirement for the additional reason that the Resolutions covering those transactions specified a forty-year goodwill amortization period.

We affirm the Court of Federal Claims' conclusion that Home was not required by GAAP to write off supervisory goodwill when it sold the branches acquired in the supervisory mergers between 1993 and 1995. As the court found, the contract, not GAAP, controlled the amortization period for Home's supervisory goodwill and set that period at forty years. See Home III, 57 Fed. Cl. at 707. Thus, Home was not required by GAAP to write off supervisory goodwill related to branch sales prematurely.

Furthermore, the Court of Federal Claims correctly determined that Home's post-FIRREA branch sales did not affect the damages. FIRREA had breached the government's promise to count supervisory goodwill in 1989—over four years before Home started selling the branches it had acquired in the supervisory mergers in question. Id. at 707. These sales were "[u]nrelated events and remote consequences"

that are not appropriate to incorporate into damages for breach of contract.  See LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1373 (Fed. Cir. 2003). Additionally, FIRREA had already been phasing out Home's ability to count supervisory goodwill when it began selling the branches, and by the time Home sold the Florida and Century branches, Home had already fully written off the supervisory goodwill from these purchases.  Thus, neither the Florida nor the Century branch sales had any effect on Home's recording of supervisory goodwill.  See Home III, 57 Fed. Cl. at 705-06.

### 4. Damages

The Court of Federal Claims largely adopted the plaintiffs' proposed model for calculating damages.  The court acknowledged that this model was "based on a critical factual assumption, namely, that supervisory goodwill disallowed by FIRREA was replaced by an equal amount of tangible capital."  Home III, 57 Fed. Cl. at 709.  The court calculated the damages as the difference between what it cost Ahmanson to raise that tangible capital and the benefit Ahmanson derived from possessing that capital instead of an equal amount of supervisory goodwill.  The cost to Ahmanson was measured by a weighted average of the rates paid on Ahmanson's stock and debt issuances between November 1989 and August 1994, and the rates Ahmanson's investors would expect on retained earnings to replace the supervisory goodwill that would have remained after 2004, when the last of Ahmanson's capital raisings would have been paid off.[7]

The government alleges four errors in the trial court's damages analysis. According to the government, the court erred by not requiring the mitigation of damages

---

[7]      The complete details of the damages model are contained in the Court of Federal Claims' opinion.  See Home III, 57 Fed. Cl. at 709-21.

at least cost, by awarding hypothetical replacement costs that lacked sufficient certainty, by determining that the damages were foreseeable, and by grossing up the award for tax purposes.

The plaintiffs contend that the court correctly calculated damages. The loss here, according to the plaintiffs, is the net cost of raising capital, analogous to "cover." The plaintiffs emphasize that the disallowance of supervisory goodwill forced them to substitute more expensive private capital, which counted toward the regulatory capital requirement, for government-backed deposits, which did not. On this reasoning, the economic harm to a thrift is the difference between the "safe rate" it would have paid for government-backed deposits and the higher rate it actually paid for private market capital that had to be raised to replace intangible supervisory goodwill.

We discuss each of the government's arguments in turn.

### a. Mitigation

According to the government, the district court incorrectly ruled that Home was entitled to maintain its desired margin between its actual regulatory capital and the minimum required by the government—its "cushion"—instead of just reducing the size of the cushion, which would have been less costly. In the alternative, the government argues, even if Home did need to replace supervisory goodwill to keep its higher cushion, the district court erred in using a "weighted average" of issuance costs for the preferred stock and subordinated debt. The government contends that the replacement cost should have been based purely on the cost of debt, which was less expensive than stock.

The plaintiffs contend that Ahmanson reasonably mitigated its damages. The plaintiffs emphasize that the law only required Ahmanson to make fair and reasonable efforts under the circumstances, and that the government has the burden of proving that Ahmanson's efforts were anything other than fair and reasonable. According to the plaintiffs, all of the evidence shows that Ahmanson needed to replace supervisory goodwill with equity capital, especially given FIRREA's new capital requirements. That is, the loss could not have been avoided by operating with a lower cushion (such as the $1 billion cushion suggested by the government in this litigation) because even reaching that lower level would have required raising more capital than Home lost in supervisory goodwill. Finally, the plaintiffs contend, Ahmanson was not required to raise all the capital by issuing debt; such mitigation efforts, in the plaintiffs' view, would have been unreasonable, and Ahmanson reasonably issued stock from time to time in the exercise of its business judgment.

We see no clear error in the trial court's factual conclusion that Ahmanson reasonably mitigated. When mitigating damages from a breach, a party "must only make those efforts that are fair and reasonable under the circumstances." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002). Here, Ahmanson was entitled to raise funds to replace the supervisory goodwill Home lost as a result of the government's breach. The duty of reasonable mitigation did not require Ahmanson simply to operate Home with a smaller capital cushion. As a conservatively run thrift, Home relied on a substantial cushion, and this prudence both appealed to Ahmanson's investors and helped Home gain regulatory approval to acquire failing thrifts. Home III, 57 Fed. Cl. at 727. Home was not required to abandon this successful business

strategy merely to reduce the government's exposure. Rather, Ahmanson was entitled to cover the loss of supervisory goodwill by private capital financing in order to maintain its conservative approach. Moreover, contrary to the government's second argument, Ahmanson did not have to raise all of the replacement capital by issuing short-term debt, which was the cheapest form of financing. Ahmanson's strategy of raising capital through various types of financing was a commercially reasonable effort to maintain its debt-to-equity ratio, and fair and reasonable efforts to mitigate are all that the law requires. Accordingly, the Court of Federal Claims justifiably used a weighted average of Ahmanson's various types of financing to calculate the replacement cost Ahmanson incurred.

### b. Replacement Costs

The government next argues that the Court of Federal Claims erred in awarding hypothetical replacement costs. The government insists that economic principles prove that capital has no cost other than transaction costs because raising capital represents a zero-sum exchange. Pursuant to these principles, Ahmanson got what it paid for, namely, the right to use capital temporarily, so the fair price it paid for that capital did not represent a harm to Ahmanson. Further, because Ahmanson raised capital for a variety of reasons and did not specify which portion of the capital it raised to replace supervisory goodwill, the government contends that there was no way of determining the actual cost of the capital that replaced the lost supervisory goodwill. Finally, according to the government, although the court recognized a tangential benefit from the replacement of supervisory goodwill with cash, the way in which the court did so— deducting the safe rate of return on this cash from the cost of raising the capital—fails to

reflect the full range of benefits Home received from its possession of tangible capital. In the government's view, using a "safe rate" of return as a proxy for the benefits of tangible capital is unfounded and speculative.

The plaintiffs argue that the replacement cost damages "reflect the precise economic benefit" of the supervisory goodwill lost due to the government's breach. According to the plaintiffs, although Ahmanson's private capital raisings were fair deals insofar as Ahmanson received something of equal value to what it gave up, that fact is irrelevant because Ahmanson was harmed by having to seek such deals in the first place; all such financings required the company to pay a higher rate for funds than it could have obtained from depositors had it been allowed to rely on supervisory goodwill. In addition, the plaintiffs argue, the government's assertion that Home received an additional risk-reduction benefit rests on false premises: Home was no "safer" a thrift for depositors merely because it had additional tangible capital, because its customers' deposits were already guaranteed by the government.

We see no abuse of discretion in the trial court's methodology for calculating the cost of replacement capital. The court correctly discounted the argument made by the government's expert that capital has no cost other than transaction costs, as this court had already rejected the same argument. See LaSalle Talman, 317 F.3d at 1374-75. Instead, the Court of Federal Claims properly noted that capital is not costless; its cost is the required rate of return on various terms of financing. See id. at 1375. Consequently, we hold that the court did not abuse its discretion in setting up its model.

To account for the inherent benefits of cash over intangible capital, the trial court also correctly discounted the award by the "safe rate" of return Ahmanson could earn by

investing that cash. A plaintiff's damages in a "cover" situation are discounted by "expenses saved as a result of [defendant's] breach." 14 Williston on Contracts § 40:34 (4th ed. 2000). The plaintiffs were able to save expenses as a result of the government's breach because the cash Ahmanson raised was more valuable than an equal amount of supervisory goodwill. Supervisory goodwill is an intangible asset that cannot by itself fund loans. Supervisory goodwill merely provides a thrift with "leverage," or legal permission to obtain additional deposits, whereas cash is "tangible capital" that can both provide leverage and fund loans. Thus, the cash Ahmanson raised not only contributed to Home's regulatory capital, it substituted for cash that Home would otherwise have had to raise through deposits. Home and Ahmanson reaped an incidental benefit from this cash equal to the cost of the deposits they no longer had to obtain. Because deposits were guaranteed by the government, the court estimated their cost using the rate paid for a comparable government-backed asset, the intermediate-term Treasury bond. We agree with the Court of Federal Claims that this safe rate offset "account[s] for the difference between what was lost and what was substituted." Home III, 57 Fed. Cl. at 23. The court's approach to calculating the

benefits of cash was therefore within the court's sound discretion.[8]

Contrary to the government's assertion, Ahmanson did not obtain a greater incidental benefit than the one approximated by the safe rate of return. The rate it paid for deposits would not have been changed by the increased tangible capitalization of Home, because deposits were insured by the government and therefore did not become safer simply because Home possessed more tangible capital.

### c. Foreseeability

Third, the government argues that the Court of Federal Claims erred in determining that the damages it awarded were foreseeable. Given Home's large capital cushion, the government contends that it was unforeseeable that Ahmanson would incur expenses to replace the lost supervisory goodwill, particularly at a cost of $81 million, when it could simply have operated Home with a smaller capital cushion. The government further claims that the size of the award and the piecemeal nature of Ahmanson's efforts to raise replacement capital were unforeseeable.

The plaintiffs deny the government's contention that the damages were unforeseeable, suggesting that raising replacement capital on a commercially reasonable basis was a more foreseeable consequence than essentially waiving the

---

[8] The government argues that this court has deemed the notion that "leverage creates wealth" a "fallacy." <u>Cal. Fed. Bank v. United States</u>, Nos. 03-5070, 03-5082, 2005 WL 95171 at *6 (Fed. Cir. Jan. 19, 2005). The court was merely quoting the government's expert witness in that case. But, even assuming this quotation accurately represents the court's holding, it does not control the present case because the bank in <u>California Federal</u> merely failed to prove that its alleged lost profits were caused by the government's breach of a supervisory goodwill promise. <u>Id.</u> at *6-8. Thus, although <u>California Federal</u> may be read as holding that a bank is not certain to make profits from supervisory goodwill, and therefore that leverage does not "create[] wealth" in that sense, the case does not stand for the proposition that goodwill has no value. Here, the plaintiffs do not seek profits they believe they would have made from leverage; they seek the cost of replacing goodwill with tangible capital.

breach by operating with a reduced capital cushion or cutting back on loans, as the government proposes they should have done.

The Court of Federal Claims did not clearly err by finding that the damages claimed by Home were foreseeable. Supervisory goodwill functioned at the time of the acquisitions as an inducement for Home to take over ailing thrifts. To take on the assets of the thrifts it acquired, Home would have had to raise additional regulatory capital if it had not had the opportunity to rely on supervisory goodwill. Consequently, as the Court of Federal Claims found, the regulators undoubtedly would have understood when they promised to allow supervisory goodwill that taking away this inducement would cause Home to "re-evaluate [its] capital ratio[]" and "take on replacement capital." Home III, 57 Fed. Cl. at 726. As the government's regulators were aware of Home's practice of maintaining a conservative capitalization ratio, the government in this case should have expected Home to seek to restore that ratio after the passage of FIRREA. See id. at 727.

### d. Tax Gross-up

Fourth, the government challenges the trial court's action in grossing up the damages award to account for taxes. According to the government, Ahmanson is unlikely to pay taxes on this award given its ability to draw on tax planning resources. Moreover, the government says, future tax rates are unknown, so adjusting damages based on projected rates of taxation is speculative.

The plaintiffs defend the tax adjustment to the award. Because the damages must reflect after-tax harm, the plaintiffs say, Ahmanson would not be made whole without a tax gross-up. The plaintiffs also characterize uncertainty over future tax rates

as minor and argue that such concerns should not preclude recovery because the burden of imprecision falls on the breaching party, the government.

The Court Federal of Claims properly adjusted the damages award to reflect tax consequences. The parties cite no Federal Circuit authority that deals specifically with this issue, and we have found none. We adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable. See Oddi v. Ayco Corp., 947 F.2d 257, 267 (7th Cir. 1991); First Nationwide Bank v. United States, 56 Fed. Cl. 438, 449 (2003); see also LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 110 (1999), aff'd in part and vacated in part, 317 F.3d 1363 (Fed. Cir. 2003) (acknowledging the possibility of adjusting an award for tax purposes but finding plaintiff's tax figures too speculative on the particular facts of the case). The Court of Federal Claims found that Ahmanson's award compensated it for lost monies that would not have been taxable. The court further determined that the award would be taxed as gross income of Washington Mutual, the current parent company of Home and Ahmanson. Home III, 57 Fed. Cl. at 730-31. These conclusions are not clearly erroneous. In view of the expert testimony offered at trial, the court also did not clearly err in determining the rate at which Washington Mutual would pay taxes on the award. See id. at 730-31. We therefore affirm the court's tax gross-up of the award.

### 5. Cross-Appeal—Authority to Enter into Contracts

The plaintiffs contest the Court of Federal Claims' holding that the contracts involving the four Ohio-insured thrifts were invalid because FSLIC and FHLBB had no authority to allow supervisory goodwill with respect to acquisitions of state-insured

thrifts. According to the plaintiffs, the Court of Federal Claims misconstrued the reach of 12 U.S.C. § 1729(f) by concluding that it limited the government's general § 1725(c) authority to promise to allow supervisory goodwill. The plaintiffs assert that the result reached in the present case by the Court of Federal Claims is inconsistent with the Supreme Court's decision in Winstar, because the Winstar Court upheld supervisory goodwill promises to acquiring institutions uninsured by the federal government, even though § 1729(f)(2) only grants such authority for the merger of one insured institution with another. See Winstar, 518 U.S. at 890-91 (citing § 1729(f)(2)); Winstar v. United States, 64 F.3d 1531, 1537-38 (Fed. Cir. 1995) (describing the acquiring institutions). The Supreme Court did so, the plaintiffs say, because the grant of a specific regulatory power does not limit a general grant of authority.

The government advocates for affirmance on this issue by contending that FHLBB did not have authority to promise supervisory goodwill for Home's acquisition of four Ohio-insured thrifts. In the government's view, 12 U.S.C. § 1729(f) precluded FHLBB's contracting authority with respect to those thrifts that were not federally insured. The government maintains that the Winstar Court relied on both § 1725(c) and § 1729(f) to find a contract for supervisory goodwill for the acquisition of federally insured institutions, and that reasoning is inapplicable to Home because not all the thrifts Home acquired were federally insured. This is so, the government asserts, because the Supreme Court relied not on § 1729(f)(2), but on § 1729(f)(3), which authorized FSLIC to provide acquirers "with such financial assistance as it could provide an insured institution" where they were "acquiring the assets of an insured institution." The government contends that Home's position would impermissibly use a general

statute to control or limit a specific one, because § 1729(f)(3) only enables the government to promise assistance to acquirers of federally insured thrifts.

We vacate the Court of Federal Claims' summary judgment ruling that disallowed Ahmanson's claim for damages related to the four Ohio-insured thrifts. FSLIC and FHLBB did have authority to promise supervisory goodwill with respect to these acquisitions. The statutory grants of authority—one general and one specific—overlap rather than conflict, and here FSLIC and FHLBB had the authority to enter into these contractual arrangements under the general provision, § 1725(c). The specific grant of authority in § 1729(f) does not implicitly limit § 1725(c)'s general grant of authority. Accordingly, both can and should be given effect. Morton v. Mancari, 417 U.S. 535, 551 (1974). To do otherwise would essentially nullify the grant of general authority in § 1725(c). That general provision was enacted prior to § 1729(f)(2), and there is no indication that Congress intended to nullify it by passing § 1729(f)(2). See id. at 549-51.

Additionally, the Supreme Court necessarily relied on the general grant of authority under § 1725(c) as authorization for two of the three transactions in Winstar. See 518 U.S. at 890. These transactions were not otherwise authorized under § 1729(f)(2) because that provision applies only when both parties to a merger are federally insured institutions. See 12 U.S.C. § 1729(f)(2) (repealed 1989) (authorizing the government to guarantee one "insured institution against loss by reason of its merging or consolidating with or assuming the liabilities and purchasing the assets of [another] insured institution" (emphases added)). The government's argument that the Supreme Court was actually relying on § 1729(f)(3) is unpersuasive, because the Court directly quoted §1729(f)(2), not § 1729(f)(3), in holding that FSLIC was authorized to

allow supervisory goodwill. See Winstar, 518 U.S. at 890-91. In fact, the Court did not cite § 1729(f)(3) even once in Winstar. Thus, Winstar unequivocally demonstrates that transactions authorized by § 1725(c) need not also be authorized under § 1729(f)(2).

The Court of Federal Claims found that the government made a promise to allow supervisory goodwill with respect to the entire Ohio transaction, even though it held the promise was not binding with respect to the state-insured thrifts because the government lacked authority to make that promise. Home I, 50 Fed. Cl. at 440-41. We have rejected that basis for finding the promise non-binding. However, the government also argued that the agreement over the Ohio-insured thrifts was not binding due to lack of consideration, and the court did not address this argument. Id. at 441. Therefore, the issue of whether there is a binding promise regarding the Ohio-insured thrifts remains pending. We remand the matter to the Court of Federal Claims for further proceedings to determine liability and, if applicable, damages related to the Ohio-insured thrifts.

## III. CONCLUSION

For the reasons stated above, we affirm the Court of Federal Claims' decisions on privity, liability with respect to the federally insured thrifts, and damages, and we vacate its ruling on liability with respect to the Ohio-insured thrifts. The case is remanded for further proceedings consistent with this opinion.

No costs.

AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED