# United States Court of Appeals for the Federal Circuit

05-5164

LASALLE TALMAN BANK, F.S.B.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Wilber H. Boies, McDermott, Will & Emery, of Chicago, Illinois, argued for plaintiff-appellee. With him on the brief were Marie A. Halpin and Suzanne M. Wallman. Also on the brief was Thomas P. Steindler, of Washington, DC.

William F. Ryan, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Tarek Sawi and John J. Todor, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge Eric G. Bruggink

# United States Court of Appeals for the Federal Circuit

05-5164

LASALLE TALMAN BANK, F.S.B.,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

_____

DECIDED: August 25, 2006
_____

Before NEWMAN, LOURIE, and LINN, <u>Circuit Judges</u>.

LOURIE, <u>Circuit Judge</u>.

The government appeals from the decision of the United States Court of Federal Claims (the "Claims Court") awarding LaSalle Talman Bank, F.S.B. ("LaSalle") $146.7 million in "cost-of-replacement-capital" damages. Because the Claims Court did not clearly err in awarding those damages, we affirm. Moreover, because the Claims Court did not clearly err in determining that the cost-of-replacement-capital damages award will most likely be subject to income taxation, we affirm its decision to upwardly adjust the damages award to reflect LaSalle's effective tax rate of 39.5%.

BACKGROUND

Talman Home Federal Savings and Loan Association of Illinois ("Talman"), Appellee LaSalle's predecessor, was formerly a stockholder-owned association. In 1982, Talman and several other Illinois thrifts were failing or had failed due to an extreme rise in interest rates. LaSalle Talman Bank, F.S.B. v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003) ("LaSalle I"). To sustain the savings and loan industry and to avoid exhaustion of the Federal Savings and Loan Insurance Corporation ("FSLIC") insurance fund, federal authorities consolidated failing or failed thrifts into associations that were more efficient, received closer regulatory oversight, and received significant assistance from the government. This assistance included direct monetary contributions, regulatory forbearances, and, of particular interest to this case, authorization to use a purchase accounting system whereby assets and liabilities would be revalued at market price and the ensuing net liability would be recorded as an asset called "supervisory goodwill." Id. at 1367. A more detailed discussion of the savings and loan crisis of the early 1980's is provided in United States v. Winstar Corp., 518 U.S. 839 (1996).

By utilizing supervisory goodwill and making a series of sound business decisions, Talman reached a state of profitability in 1986. Id. at 1368. In 1988 and 1989, Talman distributed to its shareholders a total of $1.9 million and $2.4 million, respectively, in dividends that were purportedly based on the thrift's past and projected future earnings. Id. After the enactment and implementation of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (Aug. 9, 1989), however, Talman's entitlement to account for

supervisory goodwill was phased out, and the thrift failed to meet that statute's new stringent capital requirements. On the brink of federal receivership, in February 1992, ABN AMRO, the North American subsidiary of a Netherlands bank, bailed out Talman by purchasing all of its outstanding common stock for $97 million. Id. At that time, ABN AMRO also infused Talman with $300 million in cash so that it could meet FIRREA's capital requirements. Id. Some years after the acquisition, ABN AMRO merged Talman with LaSalle Cragin Bank and named the merged thrift LaSalle Talman Bank, F.S.B. A more detailed discussion of the financial and regulatory arrangements made between Talman and the government is provided in LaSalle I.

After weathering the difficult financial circumstances that lasted from the 1980's to the early 1990's, Talman, and now LaSalle, has remained a viable business. From 1993 to 1998, the Claims Court determined that ABN AMRO provided $800 million in cash beyond the initial $300 million in 1992 so that LaSalle could continue to expand and be profitable. Id. at 1369. During that time, LaSalle distributed dividends to ABN AMRO totaling $417.8 million. Id. Those dividends were classified as either "mandatory" or "special." Mandatory dividends were payments equal to one-third of LaSalle's budgeted net income that ABN AMRO, the parent corporation, required LaSalle to make. Special dividends were supplemental payments that LaSalle made to ABN AMRO if it had excess capital and the financial wherewithal.[1] Special dividends were discretionary in that, before they could be declared, LaSalle had to obtain approval from ABN AMRO.

---

[1]    ABN AMRO required a capital level for its subsidiary banks of 50 basis points above well-capitalized minimums.

05-5164                                          -3-

In LaSalle I, we affirmed the Claims Court's decision that the government, through its enactment and implementation of FIRREA, breached its contract with Talman that allowed Talman to account for supervisory goodwill. Id. at 1370. We determined that, "[a]s discussed in Winstar, the right to account for goodwill as a capital asset to meet regulatory requirements, and to amortize it over an extended period, was abrogated by FIRREA." Id. We vacated and remanded, however, that portion of the Claims Court's decision rejecting LaSalle's claim for damages, except for the award of $5,008,700 for expenses that Talman incurred in connection with its FIRREA-induced sale to ABN AMRO. Id. at 1366. We noted that the Claims Court correctly recognized that LaSalle could recover "cost of replacement capital" that it incurred due to the breach, viz., the cost of substituting real capital (ABN AMRO's $300 million cash infusion) for supervisory goodwill that was no longer available. Id. at 1374. Nonetheless, we concluded that the court erred in ruling that because LaSalle did not incur a legally enforceable cost for the $300 million in replacement capital that it had received, there were no damages under the cost-of-replacement-capital theory. Id. at 1373. We determined that "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings." Id. at 1375 (citations omitted). We further noted that "[a]ll capital raised by a corporation has a cost, and it is well established that the payment of dividends is a capital cost." Id. (citations omitted). Thus, we instructed the Claims Court to calculate on remand the cost of replacement capital for ABN AMRO's $300 million cash infusion attributable to the dividends that were paid out of Talman's and LaSalle's earnings.[2] Id.

---

[2] In LaSalle I, we also vacated and remanded the Claims Court's finding

The Claims Court conducted a second trial in February 2004. In February 2005, the court instructed the parties to calculate the cost-of-replacement-capital damages based on certain modifications that it had made to LaSalle's proffered model for calculating those damages. LaSalle Talman Bank, F.S.B. v. United States, 64 Fed. Cl. 90, 107 (2005) ("LaSalle II"). The court's modified damages model counted all dividends that could be considered a return on ABN AMRO's initial $300 million investment, and identified that sum of dividends as the cost of replacement capital. Id. In doing so, the court did not distinguish between mandatory and special dividends. Id. at 111. As a factor mitigating the damages award, the court then required the parties to subtract from the sum of dividends constituting a return on capital the benefits that LaSalle derived from having $300 million in cash rather than $300 million worth of supervisory goodwill. Id. at 107, 111-12. The court's modified damages model further reduced the cost-of-replacement-capital award by the amount of dividends that Talman would have distributed to its stockholders had there been no FIRREA-induced breach. Id. at 108, 112. According to the court, that adjustment was necessary to reflect a cost avoided by LaSalle. Id. at 110. After applying the court's modifications to LaSalle's damages model, the parties stipulated to $146.7 million in cost-of-replacement-capital damages, which the court then entered as a final judgment.

In addition, the Claims Court agreed with LaSalle that the cost-of-replacement-capital damages award would most likely be subject to income taxation. Id. at 116.

that there were no lost profits. Id. at 1374. In making this finding, the court considered post-breach profits that were attributable to ABN AMRO's $800 million cash infusion, which we determined to be unrelated to the government's FIRREA-induced breach. On remand, only considering profits attributable to ABN AMRO's initial $300 million cash infusion, the Claims Court awarded LaSalle $3.28 million in lost profits. The government has not appealed that lost profits award and thus we will not address it.

Thus, in order to put LaSalle in the same position that it would have been in had there been no breach, the court "grossed-up" the damages award by LaSalle's anticipated effective tax rate. Id. According to the trial court, LaSalle sought "the cost of replacement capital as part of a claim for expectancy damages. The dividend costs were an expense incurred in order to put [LaSalle] back into a pre-breach position with respect to its earning capacity. . . . [The trial court has] no reason to believe that the Internal Revenue Service would treat the reimbursement of this cost item as a replacement of a capital asset [, which is not taxable]." Id. The court further noted that, "as a general proposition, amounts received as damages in litigation are taxable as income." Id. The court also found, relying on the testimony of Martin Eisenberg, tax director for both ABN AMRO and LaSalle, that LaSalle's effective tax rate for the damages award would be 39.5%. Id. at 118.

The government timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

We review the Claims Court's legal determinations without deference and its findings of fact for clear error. Home Sav. of Am. v. United States, 399 F.3d 1341, 1346 (Fed. Cir. 2005). We review the trial court's methodology for calculating the cost-of-replacement-capital damages for an abuse of discretion. Id. at 1347.

On appeal, the government argues that the trial court erred by not considering dividends that Talman would have continued to pay but for the FIRREA-induced breach ("but-for dividends"). According to the government, the trial court erred in accepting LaSalle's contention that but-for dividends were irrelevant to the damages analysis.

05-5164 -6-

Had the court properly considered but-for dividends, the government asserts, there would have been no net damages because the but-for dividends would have been greater than the dividends that Talman, and later LaSalle, actually paid ABN AMRO as a return on its $300 million cash infusion.

We disagree with the government that the Claims Court failed to properly consider dividends that the bank would have paid but for the FIRREA-induced breach. By instructing the parties to calculate damages by prorating the total sum of the dividends using the percentage of infused capital that the $97 million stock purchase represented, the Claims Court did take into account but-for dividends.[3] LaSalle II, 64 Fed. Cl. at 108, 112. Moreover, the trial court did not fail to account for Talman's past history of dividend distribution in its analysis. Based on trial testimony, the court did not clearly err in determining that the dividends that Talman distributed in 1988 and 1989 were not an accurate indicator of how Talman would have continued to distribute dividends in the future had there been no FIRREA-induced breach. Id. at 110.

We also conclude that the Claims Court's methodology of accounting for but-for dividends was not an abuse of discretion. The trial court's methodology presumed that, regardless of Talman's past history of dividend distribution, some portion of the dividends that were distributed after ABN AMRO provided the $300 million cash infusion was necessarily a return on capital. That presumption is consistent with LaSalle I, in which we stated that "[a]ll capital raised by a corporation has a cost." 317 F.3d at 1375.

---

[3] For example, in 1992, prior to any cash infusion by ABN AMRO aside from the initial $300 million, if LaSalle had distributed a $10 dividend the court would have considered approximately $2.44 of that dividend to be the but-for dividend (97/397)—an avoided cost—and $7.56 of that dividend to be the cost of replacement capital (300/397).

Moreover, given that Talman and LaSalle did not specify what portion of its dividends was a return on the $97 million stock purchase rather than the $300 million cash infusion, it was reasonable for the trial court to prorate the applicable dividends using the ratio of those investment amounts.

The government next contends that the Claims Court erred in not requiring LaSalle to prove proximate causation between ABN AMRO's $300 million cash infusion and certain dividends that LaSalle claimed were a cost of replacement capital. According to the government, the trial court improperly assumed that a portion of every dividend that LaSalle distributed, no matter how unrelated to and remote from the $300 million cash infusion, was a return on capital. To support its position, the government points to LaSalle's payment of special and mandatory dividends. The government argues that mandatory dividends were predetermined scheduled payments that ABN AMRO required of LaSalle, and thus that they "could be justified" as a cost of replacement capital. Special dividends, however, the government asserts, should not have been counted as a cost of replacement capital. Citing LaSalle's internal policy for distribution of special dividends, the government contends that those dividends were discretionary and that they were distributed for reasons unrelated to ABN AMRO's $300 million cash infusion; e.g., in one instance, a special dividend was distributed because another ABN AMRO subsidiary bank needed capital.

We conclude that the Claims Court did properly require LaSalle to establish the requisite proximate causation between the dividends counted in the court's cost-of-replacement-capital damages award and the government's FIRREA-induced breach. The trial court determined that it was foreseeable that the government's breach would

require LaSalle to replace supervisory goodwill with tangible capital, and we noted that "[a]ll capital has a cost." LaSalle II, 64 Fed. Cl. at 106-07 (citing LaSalle I, 317 F.3d at 1375). We further recognized that dividends can be a form of payment for cost of replacement capital. LaSalle I, 317 F.3d at 1375. Thus, LaSalle established proximate causation.

Nor did the trial court abuse its discretion in counting special dividends in the cost-of-replacement-capital damages award. The court relied on Professor Christopher James, LaSalle's damages expert witness, who calculated the cost-of-replacement-capital damages based on dividends that reflected a return on capital, regardless whether the dividends were called special or mandatory. We implicitly approved of this approach in LaSalle I, in which we stated that "[i]n general, payment of a return on capital reflects the cost of capital." Id. Tellingly, in LaSalle I, we did not distinguish between special and mandatory dividends. Thus, we conclude that the trial court did not abuse its discretion in employing a methodology that counted all dividends, including special dividends, that were a return on capital as part of the cost-of-replacement-capital damages award.

Furthermore, we reject the government's argument that special dividends were distributed for reasons other than as a return on capital, and thus should not count as a cost of replacement capital. As the trial court recognized, just because ABN AMRO had a particular reason for declaring dividends, e.g., that another ABN AMRO subsidiary bank needed additional capital, it does not mean that those dividends cannot also be considered a return on capital. LaSalle II, 64 Fed. Cl. at 111. On the contrary, there was testimony in the record from LaSalle's executives that as long as dividends were

paid out of LaSalle's retained earnings, regardless whether they were called special or mandatory dividends, they were considered a return on investment. The trial court did not clearly err in crediting that testimony. Id. (stating that "the relevant criteria is the source of the funds, not the name given to the dividend"). Moreover, the court did not clearly err in crediting the testimony of Professor James, who conducted a "careful review" of LaSalle's financial record to discern both special and mandatory dividends that were a return on capital. Id. Thus, we conclude that there was no clear error in the court's finding that certain special dividends were a return on ABN AMRO's $300 million cash infusion.

Lastly, the government assigns error to the Claims Court's gross-up of the damages award based on the expectation that the award would be subject to income taxation. The government makes three arguments to support its position: (1) LaSalle does not pay its own taxes, but rather its parent, ABN AMRO, files a consolidated return; (2) because the cost-of-replacement-capital damages award is not intended to increase LaSalle's wealth, the IRS is unlikely to treat it as taxable income; and (3) the court's gross-up of the award does not conform to LaSalle's historical tax rate.

We affirm the Claims Court's decision to gross up the damages award to reflect a 39.5% tax rate. We addressed a similar issue in Home Savings, viz., whether a gross-up of the cost-of-replacement-capital damages award was appropriate given that it was the parent company that would pay taxes on the subsidiary thrift's damages award. 399 F.3d at 1356. In Home Savings, we concluded that such a gross-up was appropriate. Id. Similarly here, we discern no clear error in the court's finding that, because the cost of replacement capital represented a return on capital, the IRS would treat the damages

award as a taxable item even though LaSalle's taxes would be paid as part of a consolidated tax return filed by ABN AMRO. In view of testimony offered at trial, we also conclude that the Claims Court did not clearly err in determining LaSalle's effective tax rate to be 39.5% for the damages award.

We have considered the government's remaining arguments, including the argument supporting its request that we verify whether LaSalle does indeed pay taxes on the cost-of-replacement-capital damages award, and we find them to be unpersuasive.

## CONCLUSION

We affirm the Claims Court's decision awarding LaSalle $146.7 million in cost-of-replacement-capital damages. We also affirm the court's decision to increase the damages award to account for anticipated income tax payments at a rate of 39.5%.

## AFFIRMED