# United States Court of Appeals
# for the Federal Circuit

---

**LOUIS J. BALESTRA, JR., PHYLLIS BALESTRA,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2014-5127

---

Appeal from the United States Court of Federal Claims in No. 1:09-cv-00283-VJW, Judge Victor J. Wolski.

---

Decided: October 13, 2015

---

MARY MONAHAN, Sutherland Asbill & Brennan LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by ADAM B. COHEN.

JONATHAN S. COHEN, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JENNIFER MARIE RUBIN, CAROLINE D. CIRAOLO.

---

Before LOURIE, PLAGER, and DYK, *Circuit Judges.*

PLAGER, *Circuit Judge.*

## INTRODUCTION

This is a tax refund case. The Balestras seek a refund of $3,285.26 for Federal Insurance Contribution Act ("FICA") tax paid on certain deferred compensation—retirement benefits in this case—that Mr. Balestra will never receive due to his employer's bankruptcy proceedings.

The tax was based on a calculation of the "amount deferred" under 26 U.S.C. § 3121(v)(2)(A) (2000). Congress did not define the phrase "amount deferred." Instead, the Department of the Treasury ("Treasury") promulgated a regulation defining the "amount deferred" in terms of the deferred compensation's "present value." This definition prohibited any consideration of an employer's financial condition (e.g., bankruptcy) in calculating the amount deferred. *See* 26 C.F.R. § 31.3121(v)(2)-1(c)(2)(ii).

The Balestras challenge this regulation as inconsistent with the statute, citing the analysis required by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). They also contend that the regulation is arbitrary and capricious under *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983).

After exhausting their administrative remedies before the Internal Revenue Service, they brought suit in the U.S. Court of Federal Claims seeking a refund of the taxes paid. When the trial court denied them a remedy, they brought this appeal.

## BACKGROUND

### A.

FICA tax includes both the social security tax and the hospital insurance tax. *See* 26 U.S.C. §§ 3101(a)–(b).

This case concerns FICA tax and the hospital insurance tax in particular. The hospital insurance tax is imposed on every individual's income. *Id.* § 3101(b). The tax is collected by a withholding mechanism. *Id.* § 3102(a). The taxpayer's employer collects and remits the tax due by deducting the amount of the tax from the employee's wages as and when paid. *Id.*

For the relevant 2004 tax year, the hospital insurance tax was 1.45% of an individual's "wages" received with respect to employment. *Id.* § 3101(b)(6); 26 C.F.R. § 31.3101-2(c). "Wages" are defined in 26 U.S.C. § 3121(a) and include the deferred compensation at issue. On appeal, the parties do not dispute this fact.

A critical question is when the wages are received.

Generally, wages are received when they are paid by the employer to the employee, and wages are paid by the employer when they are actually or constructively paid. 26 C.F.R. § 31.3121(a)-2. The same rule is generally true for FICA tax purposes. *Id.* § 31.3121(v)(2)-1(a)(1).

However, some wages—including the deferred compensation at issue here—are treated differently under the "special timing rule" for FICA tax purposes. *Id.* § 31.3121(v)(2)-1(a)(2). This special timing rule only applies to wages under 26 U.S.C. § 3121(a) if those wages are from a "nonqualified deferred compensation plan" as described in 26 C.F.R. § 31.3121(v)(2)-1(b). *Id.* Both Congress and Treasury define "nonqualified deferred compensation plan." *See* 26 U.S.C. § 3121(v)(2)(C) (Congress's definition); 26 C.F.R. § 31.3121(v)(2)-1(b) (Treasury's definition). The parties agree that the plan at issue is such a plan.

With respect to nonqualified deferred compensation plans, Congress provided that:

> Any **amount deferred** under a nonqualified deferred compensation plan shall be taken into ac-

count for purposes of this chapter as of the later of—(i) when the services are performed, or (ii) when there is no substantial risk of forfeiture of the rights to such amount.

26 U.S.C. § 3121(v)(2)(A) (emphasis added).

Some nonqualified deferred compensation plans—including the plan at issue—are also "nonaccount balance plans" as described in 26 C.F.R. § 31.3121(v)(2)-1(c)(2). For such plans, Treasury defined an "amount deferred" in terms of the "present value" of the deferred compensation (the future payments). 26 C.F.R. § 31.3121(v)(2)-1(c)(2)(i).

Treasury defined "present value" in this context:

For purposes of this section, *present value* means the value as of a specified date of an amount or series of amounts due thereafter, where each amount is multiplied by the probability that the condition or conditions on which payment of the amount is contingent will be satisfied, and is discounted according to an assumed rate of interest to reflect the time value of money. For purposes of this section, the present value must be determined as of the date the amount deferred is required to be taken into account as wages under paragraph (e) of this section using actuarial assumptions and methods that are reasonable as of that date. For this purpose, a discount for the probability that an employee will die before commencement of benefit payments is permitted, but only to the extent that benefits will be forfeited upon death. **In addition, the present value cannot be discounted for the probability that payments will not be made (or will be reduced) because of the unfunded status of the plan, the risk associated with any deemed or actual investment of amounts deferred under the plan, the risk that the em-**

> **ployer, the trustee, or another party will be unwilling or unable to pay, the possibility of future plan amendments, the possibility of a future change in the law, or similar risks or contingencies.** Nor is the present value affected by the possibility that some of the payments due under the plan will be eligible for one of the exclusions from wages in section 3121(a).

*Id.* § 31.3121(v)(2)-(1)(c)(2)(ii) (emphasis added).

### B.

As a result of this statutory and regulatory background, the Balestras effectively paid FICA tax on wages they will never receive.

Mr. Balestra was employed as a pilot by United Airlines ("United") from January 29, 1979 until his retirement on October 1, 2004. Upon retirement, Mr. Balestra was eligible to receive retirement benefits through a nonqualified deferred compensation plan that was also a nonaccount balance plan. He was to receive, inter alia, continuing payments for the rest of his life. He elected to start his benefits effective the day of his retirement. United, as his employer, therefore withheld hospital insurance tax from Mr. Balestra in the 2004 tax year. Mr. and Mrs. Balestra filed a joint return for that tax year.

The tax withheld by United was based on the then-applicable 1.45% statutory tax rate applied to the present value of the deferred compensation that Mr. Balestra was to receive under the plan. In compliance with the statute and regulation at issue, United calculated the present value of the deferred compensation to be $289,601.18. United therefore withheld 1.45% of this amount ($4,199.22) in hospital insurance tax from Mr. Balestra.

United was set to pay Mr. Balestra retirement benefits for the duration of his life. However, United had entered bankruptcy proceedings in 2002, and its obliga-

tions to pay these benefits were eventually discharged in those proceedings. United ceased paying benefits to Mr. Balestra in 2010.

As a result, Mr. Balestra actually received only $63,032.09 in benefits, even though he effectively (through his employer's withholding) paid a hospital tax based on $289,601.18 in benefits. Since the Balestras filed a joint tax return in 2004, they seek a refund of $3,285.26—the amount of tax paid on compensation they will never receive.

In May 2007, the Balestras filed an administrative claim before Treasury requesting a refund of the tax paid. That claim was denied.

In May 2009, the Balestras filed the present action for a refund in the United States Court of Federal Claims ("trial court"). The trial court granted the Government's motion for summary judgment and denied the Balestras' cross-motion for summary judgment. The trial court determined, inter alia, that the regulation at issue, 37 C.F.R. § 3121(v)(2)-1(c)(2)(ii), satisfies *Chevron* and *State Farm*. The trial court also denied as moot the Balestras' motion to amend their complaint to add a defense.

The Balestras timely appealed. Before this court, they argue that the regulation does not satisfy *Chevron* or *State Farm*. They contend that under the terms of the governing statute, the regulation is invalid or inapplicable to their situation because United was in bankruptcy proceedings when the deferred compensation's present value was calculated. They also contend that the regulation is arbitrary and capricious because it departs from the plain meaning of "present value" without a sufficient explanation.

We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## Discussion

We review the trial court's grant of summary judgment without deference. *Consolidation Coal Co. v. United States*, 615 F.3d 1378, 1380 (Fed. Cir. 2010). The trial court was bound by the Rules of the United States Court of Federal Claims ("RCFC"). Under those rules, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). We review the court's denial of a motion to amend a complaint for abuse of discretion. *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1348 (Fed. Cir. 2015).

We agree with the Balestras that, regarding an agency with rulemaking authority such as Treasury, we review the agency's regulatory interpretation of a statute it administers under the Supreme Court's guidance in *Chevron*. *See Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 52–58 (2011); *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012).[1] We evaluate the agency's explanation for its

---

[1] Congress delegated authority to Treasury to prescribe the necessary rules and regulations for the statute at issue because it is part of Title 26 of the U.S. Code. *See* 26 U.S.C. § 7805(a). Treasury determined that, with regard to the regulation at issue here, it need not follow 5 U.S.C. § 553(b) and engage in formal rulemaking. Treasury acted under § 7805(a) and promulgated the final rule after publishing the proposed rule; soliciting and addressing public comments; and holding a public hearing. *See* FICA Taxation of Amounts Under Employee Benefit Plans, 61 Fed. Reg. 2194, 2195, 2199 (proposed Jan. 25, 1996); Federal Insurance Contributions Act (FICA) Taxation of Amounts Under Employee Benefit Plans, 64 Fed. Reg. 4542, 4546 (Jan. 29, 1999); Federal Insurance Con-

action under *State Farm* to determine if it is arbitrary or capricious.[2] *Mayo*, 562 U.S. at 52–58; *Dominion*, 681 F.3d at 1317.

## I.

### Treasury's Regulation Satisfies *Chevron*

Under the *Chevron* framework, we begin by using the ordinary tools of statutory construction to determine whether Congress's intent is clear regarding the precise question at issue. *Chevron*, 467 U.S. at 842–43, 843 n.9; *City of Arlington v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013). These tools include the statute's text and structure, canons of statutory construction, and legislative history. *Gilead Scis., Inc. v. Lee*, 778 F.3d 1341, 1348 (Fed. Cir. 2015).[3]

---

tributions Act (FICA) Taxation of Amounts Under Employee Benefit Plans; Correction, 64 Fed. Reg. 15687 (Apr. 1, 1999).

[2] This analysis often overlaps with the second step of the *Chevron* framework. *See, e.g.*, *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 669 F.3d 1340, 1348 (Fed. Cir. 2012). *See also* Richard J. Pierce, Jr., Administrative Law Treatise § 3.6 (5th ed. 2010).

[3] Some place the use of these tools within the second step of *Chevron*. *Compare Suprema, Inc. v. Int'l Trade Comm'n*, 796 F.3d 1338 (Fed. Cir. 2015) (en banc), *with Gilead Scis.*, 778 F.3d at 1346–49. Legislative history in particular is sometimes placed in the second step. *See* 4 Charles H. Koch, Jr. & Richard Murphy, Administrative Law and Practice § 11:33 (3d ed. Supp. 2015) (footnote omitted) ("Scholars debate whether legislative history may be used in *Chevron* step one to determine clear legislative intent or step two to interpret ambiguous language. As a practical matter it makes no

If Congress's intent is clear, then we give effect to Congress's unambiguously expressed intent. *Chevron*, 467 U.S. at 842–43. However, if that intent is not clear, then we determine whether the agency's interpretation of the statute is a reasonable one. *Id.* at 842–44. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843–44. We afford such legislative regulations "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844 (footnote omitted). If the legislative delegation is implicit, then a court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* (footnote omitted).

## A.

In determining whether *Chevron* deference is owed in this instance, we begin with the language of the statute and the ordinary tools of statutory construction to determine whether Congress directly addressed the precise question at issue. *See, e.g., Gilead Scis.*, 778 F.3d at 1347.

The parties do not dispute the formulation of the question. The question is how employers must calculate the "amount deferred" under nonqualified deferred compensation plans that are also nonaccount balance plans for the purposes of FICA (hospital insurance) tax, and, more pointedly, whether the "amount deferred" can be defined as the compensation's "present value" without consideration of an employer's financial condition.

The relevant statute provides that:

difference whether a court tests an agency's use of legislative history under step one or two.").

> Any **amount deferred** under a nonqualified de-
> ferred compensation plan shall be taken into ac-
> count for purposes of this chapter as of the later
> of—(i) when the services are performed, or (ii)
> when there is no substantial risk of forfeiture of
> the rights to such amount.

26 U.S.C. § 3121(v)(2)(A) (emphasis added).[4]

Neither the statute nor the ordinary tools of statutory construction reveal any clear, unambiguously expressed congressional intent on the precise question at issue.

The statute does not contain a definition of the "amount deferred" or reference any way to calculate such an amount—including by determining its "present value," with or without considering an employer's financial condition.

The statute was enacted as part of the Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65, 122 (1983) ("Act"). As a bill, it was considered and passed in the House of Representatives before being considered, amended, and passed in the Senate. *See* 97 Stat. at 172. The House and Senate then agreed to a conference report. *Id.*

One of the Senate amendments contained the provision that became the statute at issue in this case. *See* 129 Cong. Rec. S6133–35 (daily ed. Mar. 18, 1983); H.R. Conf. Rep. No. 98-47, at 145-47 (1983) (comparing the House and Senate versions of the bill and describing the conference agreement). The conference agreement "generally follow[ed]" that amendment. H.R. Conf. Rep. No. 98-47, at 147.

---

[4]    With regard to subsection (ii), the Balestras concede in their brief that it is not applicable to their case. *See* Appellants' Br. at 13, 24.

Senator Bentsen introduced the amendment, and he made several statements concerning it. The Balestras cite these statements as legislative history indicating Congress's intent to impose FICA tax on the compensation's "present value" in its plain and ordinary sense as used in other parts of the tax code. According to the Balestras, Congress intended that the "present value" be calculated according to the "fair market value" of the compensation as understood from a "willing buyer-willing seller" model.

However, Senator Bentsen's statements do not support the Balestras' conclusions. Senator Bentsen stated that:

> In most cases, under nonqualified deferred compensation agreements it is a relatively simple matter to determine when amounts are deferred and the amount that is being deferred. Likewise, as in many other areas of our tax law, simple rules can be established to determine the present value of amounts deferred in other cases.

129 Cong. Rec. S6134.

When read in light of the House Conference Report, these statements indicate that Senator Bentsen, and presumably the Senate and Congress, intended to define the "amount deferred" in terms of the compensation's "present value." Neither party argues that Treasury's defining "amount deferred" in terms of "present value" itself was improper. Instead, they argue over the precise and proper meaning of "present value."

However, these statements do not evince an unambiguous congressional intent that the "present value" calculation must consider an employer's financial status. Similarly, there is nothing to indicate that "present value" is to be calculated specifically in terms of "fair market value" or the "willing buyer-willing seller" standard.

The senator's statements merely suggest that simple rules can be established. In other words, this legislative history actually supports Treasury's regulation—a relatively simple rule that the Balestras simply dislike.

We find no other legislative history, canon of construction, or salient feature of statutory structure that points to any unambiguous congressional intent on the issue. The parties, for their part, do not suggest any.

### B.

Since there is no unambiguous expression of congressional intent, we proceed to the second step of the *Chevron* framework. We must determine whether Treasury's interpretation of the statute is a reasonable one. *Chevron*, 467 U.S. at 842–44.

Treasury was faced with a statutory ambiguity—how to define the "amount deferred." Treasury devised the regulation to be workable, simple, and flexible. *See* 61 Fed. Reg. at 2195; 64 Fed. Reg. at 4543. Agencies must draw such lines and make such choices between alternatives in drafting regulations. *See Mayo*, 562 U.S. at 58–59.

Treasury chose to define the "amount deferred" in terms of "present value." 26 C.F.R. § 31.3121(v)(2)-(1)(c)(2)(ii). Treasury further chose to define "present value" by considering, inter alia, the time value of money and reasonable actuarial assumptions and methods at the time the amount deferred was taken into account as wages. *Id.* The exact value of a future payment is inherently unknowable. Treasury's definition allowed for the consideration of some contingencies but not others.

As a matter of law, was Treasury obligated to include the contingency that if the employer became bankrupt, an adjustment in the employee's tax would be made? It would seem reasonable for the rule drafters to have done

so. But the question under *Chevron* is whether it was unreasonable not to have done so.

The regulation as written would seem to comport with the scant legislative history. Nothing in the statute or congressional purpose, intent, or design precludes Treasury's definition. The definition is rational, reasonable, and does not conflict with any law.

As noted, the regulation comports with the scant legislative history relied upon by the Balestras. Senator Bentsen noted that in "most cases" it was "relatively simple" to determine the amount deferred. 129 Cong. Rec. S6134. He spoke of the "simple rules [that] can be established." *Id.* Treasury promulgated a simple and reasonable rule. We decline to substitute our own regulation in place of the reasonable one that Treasury devised in this instance.

The Balestras' arguments on this point are unpersuasive. They admit that the statute is silent on the question at issue. They admit that the regulation "may well be a reasonable interpretation of the statute" when applied to employers who are not in bankruptcy. Appellants' Br. at 41. However, they argue that the regulation is unreasonable as applied to employers in bankruptcy. They believe that the legislative history and purpose of the statute demonstrate Congress's intent to tax the present value of deferred compensation only in terms of its fair market value—measured by a willing buyer-willing seller standard as in *United States v. Cartwright*, 411 U.S. 546 (1973). Based on *Cartwright*, the Balestras argue that *any* Treasury regulation with a valuation method must result in "a realistic value that does not vary significantly from the willing buyer-willing seller standard." Appellants' Br. at 47. Any regulation deviating from this standard is—in their words—invalid.

This is not so. First, as previously discussed, the legislative history and purpose of the statute do not indicate

that Congress intended to define the "amount deferred" as the compensation's "present value" in terms of its "fair market value" under a willing buyer-willing seller standard or by necessitating an evaluation of an employer's financial condition and its ability to make future payments. The Balestras' argument hinges upon the statements of Senator Bentsen. They reason that by referencing simple rules in place in other sections of the tax code, Senator Bentsen and all of Congress intended that Treasury abide by the willing buyer-willing seller standard. As we have already discussed, the record does not support this reading.

Second, the Balestras read the import of *Cartwright* too broadly. *Cartwright* was a pre-*Chevron* case that dealt with fair market value and the willing buyer-willing seller standard in the context of the particular statute and regulation at issue in that case. *Cartwright* involved a Treasury regulation relating to 26 U.S.C. § 2031. This statute concerned the value of a decedent's property for estate tax purposes. The regulation required Treasury to value mutual fund shares at their "fair market value"— which Treasury defined as the public offering or asking price of mutual fund shares—instead of the lower redemption price (the actual price for which someone could have redeemed the shares). *Cartwright*, 411 U.S. at 549 n.5 (quoting the relevant portion of 26 C.F.R. § 20.2031-8(b)).

Treasury promulgated that regulation despite having previously stated—in the context of the same statute— that the "fair market value" was the "'price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" *Id.* at 551 (quoting 26 C.F.R. § 20.2031-1(b)). In other words, fair market value was at issue because of the particular statute and regulation in the case. It is true that the Court stated the "willing buyer-

willing seller test of fair market value is nearly as old as the federal income, estate, and gift taxes themselves, and is not challenged here." *Id.* at 551, 551 n.7 (citing a separate Treasury regulation specifically relating to the test in the context of estate tax). However, this statement does not compel the result sought by the Balestras in this case.

The Court in *Cartwright* ultimately found that the regulation was "manifestly inconsistent with the most elementary provisions of the Investment Company Act of 1940 [which regulated the mutual funds] and operate[d] without regard for the market in mutual fund shares that the Act created and regulates." *Id.* at 557. The Court stated that Congress "surely could not have intended" such a statutory interpretation. *Id.* Moreover, the Court determined that the regulation imposed an "unreasonable and unrealistic measure of value." *Id.* Treasury treated load and no-load mutual funds differently, and in seeking the higher valuation, Treasury ignored its own definition of "fair market value." *See id.* at 556–57. This case involves no such contravention of the statute or the Social Security Amendments of 1983. As previously noted, this case also involves no such congressional intent on the question of "fair market value."

The Balestras' other arguments are similarly unpersuasive. For instance, the Balestras cite several Treasury regulations relating to other sections of the tax code and numerous cases involving the willing buyer-willing seller standard and the general meaning of present value. However, without a clear indication of congressional intent on this issue (that Congress intended to keep these standards in this instance), their arguments are not persuasive. Section 3121 simply does not concern these other standards found in other areas of tax law. We may not import those standards into the statute or the regulation here.

A similar point can be made with respect to *McDonald v. Commissioner*, 764 F.2d 322 (5th Cir. 1985) and *Estate of Gresham v. Commissioner*, 752 F.2d 518 (10th Cir. 1985). The Balestras rely on both cases, but these out-of-circuit cases are neither binding nor persuasive. Both cases involve the invalidation of a Treasury regulation when the related statute explicitly required consideration of fair market value. The statute in this case never references "fair market value." Moreover, in this instance, there is no unambiguous intent or purpose requiring such a valuation.

The Balestras also heavily rely on *Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012). In that case, this court found that a Treasury regulation did not satisfy *Chevron* or *State Farm*. Contrary to the regulation in this case, the regulation in *Dominion* made "no sense" in light of the statute and was "removed from reality." *Dominion*, 681 F.3d at 1318. *Dominion* demonstrates that we follow the Supreme Court's directive in *Mayo* to apply *Chevron* deference to Treasury regulations, and that we evaluate Treasury regulations under *State Farm*. *Dominion* also demonstrates that those regulations do not always pass muster. However, in this instance, that is where the case's instructiveness ends.

Finally, by means of a supplemental letter, the Balestras cite *Altera Corp. v. Comm'r*, 145 T.C. No. 3 (2015) to support their position—both under *State Farm* and *Chevron*. The court in *Altera* invalidated a Treasury regulation because the agency failed to provide an adequate explanation for the final rule and failed to address comments and other evidence indicating the regulation was inconsistent with the statute at issue. As the Government notes, the regulation in this case does not conflict with the statute. *Altera* does not help the Balestras' position.

## II

### Treasury's Regulation Satisfies *State Farm*

Having established that the regulation satisfies *Chevron*, we turn to the Balestras' arguments regarding *State Farm*.

Under *State Farm*, we determine whether Treasury "articulate[d] a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citation omitted). Treasury's rule is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* We cannot supply a basis for agency action that the agency has not itself provided. *Id.* However, we will "'uphold a[n agency] decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (quoting *Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009) (same).

In this instance, Treasury's regulation satisfies *State Farm*. Treasury recognized that the compensation is not subject to FICA tax when paid, but at an earlier point (when the compensation is deferred). *See* 61 Fed. Reg. at 2195. Treasury recognized that "[a]pplying these statutory rules often requires difficult valuations of future benefits." *Id.* Treasury therefore focused on providing workable, simple, flexible rules for taxpayers. *Id.* As Treasury stated in its notice of proposed rulemaking:

> Recognizing practical administrative problems that can be encountered by taxpayers in this area, the proposed regulations are designed to be work-

able, to minimize complexity, and to provide appropriate flexibility for taxpayers.

*Id.*

Similarly, in its notice of final rulemaking after a public hearing, Treasury incorporated and addressed public comments, but emphasized its overarching goals:

The final regulations retain the distinction between the method of calculating the amount deferred (and the income on that amount) for account balance plans and the method for nonaccount balance plans, but provide additional guidance simplifying those calculations.

64 Fed. Reg. at 4543.

Treasury's path to calculating the "amount deferred" in terms of the compensation's "present value" without consideration of an employer's financial condition is reasonably discernable. Treasury explained that it sought simple, workable, and flexible rules when valuing future benefits. It devised a regulation that satisfied these goals while comporting with the governing statute. This is neither arbitrary nor capricious. It may seem unfair in a specific instance such as this, but in balancing the desire for simplicity against the ideal of ultimate comprehensiveness, the agency must be allowed a reasonable degree of discretion. We cannot say that this one example of consequent unfairness by the agency results in invalidating the rule-making.

The parties raise other arguments, including that the Balestras' claims are barred by the substantial variance rule as described in *Computervision Corp. v. United States*, 445 F.3d 1355 (Fed. Cir. 2006). However, these arguments are unpersuasive.

With regard to the trial court's denial of the Balestras' motion to amend their complaint, we agree with the trial

court that, in light of the disposition of their case, the motion is moot.

## CONCLUSION

For the foregoing reasons, the judgment of the United States Court of Federal Claims is affirmed.

## **AFFIRMED**